UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JORDIN WALSTON, individually and on behalf of her infant child, L.W.,<br><br>              Plaintiffs,<br><br>   -against-<br><br>CITY OF NEW YORK; MICAELLE LAFONTANT; IRENE RENDON; SHARON FAULK JEAN-PIERRE, JANE DOE; MONTEFIORE MEDICAL CENTER; and CARMEN DELEON,<br><br>              Defendants. | No. 22 Civ. 10002 (LAK) (JW)<br><br>**FIRST AMENDED COMPLAINT AND JURY DEMAND**<br><br>**PLAINTIFF DEMANDS TRIAL BY JURY** |

## CITY AND HOSPITAL SEPARATE BLACK MOTHER AND CHILD AT BIRTH BASED ON RACIST ASSUMPTIONS

1.    Plaintiff Jordin Walston spent just 48 hours with her newborn daughter, Infant Plaintiff L.W., before Montefiore Medical Center and its social worker Carmen Deleon barred Plaintiff from taking L.W. out of the hospital and the City of New York snatched L.W. from Ms. Walston's arms while she was in the middle of breastfeeding. Montefiore Medical Center detained L.W. and the City forcibly took L.W. from Ms. Walston before the two of them had even left the hospital because of nothing more than racist assumptions about Ms. Walston—a Black woman—made by Carmen Deleon, a social worker at the Montefiore Medical Center where L.W. was born.

2.    Before Ms. Deleon intervened, Montefiore was ready to discharge L.W. and Ms. Walston from the hospital together.  All indications were

that Ms. Walston would provide a safe, loving, and supportive home for L.W.  Ms. Walston received regular prenatal care throughout her pregnancy; she had substantial family support, including several family members with her at the hospital; she had procured a crib and other necessities for L.W.'s arrival home; and she was bonding positively with L.W. in the hospital.

3.      That discharge plan abruptly changed when Ms. Deleon interviewed Ms. Walston.  She wrongfully accused Ms. Walston of being aggressive and defensive, stereotypes regularly levied against Black women, and made a report to the child abuse hotline, alleging, falsely, that Ms. Walston posed a danger to her newborn baby, even though there was no evidence that Ms. Walston was unfit to care for L.W. or that L.W. was in any danger of being harmed.

4.      After Ms. Deleon's report, two Child Protective Specialists from the City's child welfare agency traveled to the hospital to investigate.  They observed that Ms. Walston was respectful throughout their conversations and noted nothing to indicate that Ms. Walston was unfit to care for L.W.  Their supervisors, neither of whom were physically present at the hospital, nonetheless ordered them to remove L.W. from Ms. Walston's care without any legal basis.

5.      One of the Child Protective Specialists—also a Black woman— regretfully told Ms. Walston that these forced family separations happen "too often" to "our kind" as she pulled L.W. from Ms. Walston's arms.

6.      For the next four days, the City kept L.W. in its custody and kept Ms. Walston and L.W. apart, preventing bonding between mother and daughter during L.W.'s very first week of life.

7.      After those four excruciating days, a Bronx County Family Court Judge ordered L.W. returned to Ms. Walston's care on the grounds that there was no basis to justify the emergency removal.

8.      Today, L.W. is safely and happily in Ms. Walston's care.  The trauma and pain of separating mother and daughter just two days after L.W. was born, however, will last a lifetime.

9.      This is a civil rights action, pursuant to 42 U.S.C. §1983, in which Plaintiffs seek declaratory relief and damages to redress the deprivation, under color of state law, of rights secured to them under the First, Fourth and Fourteenth Amendments of the United States Constitution. Plaintiffs also seek damages for the deprivation of their rights under New York law. The action arose from Defendants' illegal seizure and detention of Infant Plaintiff from adult Plaintiff without probable cause or due process of law, Defendants' interference with the liberty interest of adult Plaintiff and Infant Plaintiff in each other's care, Defendants' denial of the equal protection of law to adult Plaintiff and Infant Plaintiff, Defendants' wrongful interference with the constitutional right of Plaintiff and Infant Plaintiff to live together free of government interference, even after Infant Plaintiff and was reunited with adult Plaintiff, and Defendants' malicious

and wrongful prosecution of Plaintiff for child neglect in the New York Family Court.

## JURISDICTION AND VENUE

10.    Jurisdiction is conferred upon this Court by 28 U.S.C. §1343, which provides for original jurisdiction over all actions brought pursuant to 42 U.S.C. §1983, by 28 U.S.C. §1331, which provides jurisdiction over all cases brought pursuant to the Constitution and laws of the United States. The Court has pendent jurisdiction over Plaintiffs' state law claims and over certain Defendants pursuant to 28 U.S.C. §1367. Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiff's claims arose in this judicial district.

## THE PARTIES

11.    Plaintiff Jordin Walston ("Plaintiff") is a United States citizen, Black woman, and resident of the City and State of New York.  She is the mother of Infant Plaintiff L.W.

12.    When the events which form the basis of the instant lawsuit took place, Plaintiff lived in the Bronx, New York.

13.    Infant Plaintiff L.W. ("Infant Plaintiff") was born in 2019.

14.    Defendant City of New York ("City") is a municipal corporation, incorporated pursuant to the laws of the State of New York. Defendant City's child protective agency, known as the Administration for Children's Services ("ACS"), is authorized by New York State to investigate complaints of child abuse and neglect and to offer rehabilitative and preventive services to children and parents.

15.     Defendant Micaelle Lafontant was at all relevant times a Child Protective Specialist employed by ACS.  Defendant Lafontant is sued in her individual capacity.

16.     Defendant Irene Rendon was at all relevant times a Child Protective Supervisor II employed by ACS.  Defendant Rendon is sued in her individual capacity.

17.     Defendant Sharon Faulk Jean-Pierre was, at all relevant times, a director employed by ACS.  As a director, Defendant Faulk Jean-Pierre was a policymaker for ACS.  Defendant Faulk Jean-Pierre is sued in her individual and official capacities.

18.     Defendant Jane Doe is an individual presently unknown to Plaintiffs who was at all relevant times an employee, agent, or servant of ACS and was involved in the unlawful conduct alleged in this Complaint.  Defendant Jane Doe is sued in her individual capacity.

19.     Defendants Lafontant, Rendon, Doe, and Faulk Jean-Pierre are referred to collectively herein as the "ACS Defendants."

20.     Defendant Montefiore Medical Center ("Montefiore") is a not-for-profit corporation, organized under the laws of the State of New York, and located in the Bronx, New York.  Defendant Carmen Deleon, LMSW, was at all relevant times a Social Worker employed by Defendant Montefiore.  Defendant Deleon is sued in her individual capacity.

21.     In detaining children, including Infant Plaintiff, from their parents for purely investigatory reasons, Defendants Montefiore and DeLeon acted under color of state law.

22.     In acting jointly with Defendant City of New York to detain healthy children in the hospital for non-medical reasons, Defendants Montefiore and Deleon acted under color of state law.

## PROCEDURAL REQUIREMENTS

23.     Plaintiffs have complied with all statutory prerequisites to filing this action.

24.     Within 90 days of the events giving rise to these claims, Plaintiffs filed their respective Notices of Claims with the New York City Office of the Comptroller and the New York Corporation Counsel.  Plaintiff testified at a hearing pursuant to N.Y. General Municipal Law § 50-h for both her claims and Infant Plaintiff's claims, on May 8, 2020.

## FACTS

### Plaintiff's Healthy Pregnancy and Preparations for Her Daughter's Birth

25.     Plaintiff Jordin Walston became pregnant with Infant Plaintiff L.W. in early 2019.

26.     Defendant Montefiore provided prenatal care to Plaintiff throughout Plaintiff's pregnancy.

27.  Staff at Montefiore who provided prenatal care to Plaintiff saw that Plaintiff was a loving and caring individual, who would provide excellent care for her newborn infant.

28.  During the entire time that she was pregnant, Plaintiff was in foster care, in the legal custody of Defendant City of New York.  She had been in foster care and lived in a series of foster homes under the close supervision of an authorized foster care agency since 2013.

29.  Plaintiff lived with a certified foster parent throughout her pregnancy.

30.  Upon information and belief, Defendant City of New York contracted with a not-for-profit authorized foster care agency to provide day-to-day care and supervision of Plaintiff during the entire time that Plaintiff was pregnant.

31.  Upon information and belief, employees of the foster care agency visited Plaintiff and Plaintiff's foster mother regularly during Plaintiff's pregnancy and observed that Plaintiff was a loving and caring individual who would provide excellent care for her newborn infant.

32.  Upon information and belief, throughout Plaintiff's entire pregnancy, employees of the foster care agency made regular reports to the City of New York, Plaintiff's legal custodian, regarding Plaintiff's condition and Plaintiff's plans for her newborn.

33.  Upon information and belief, the reports were uniformly favorable and enthusiastic as to Plaintiff's preparation for motherhood.

34.    Upon information and belief, the reports were also uniformly favorable and enthusiastic regarding the ability and commitment of Plaintiff's foster mother to welcome and care for a new baby into the household.

35.    Agents and employees of Defendant City and of the foster care agency where Plaintiff was placed were aware that Plaintiff had had mental health problems when she entered foster care in 2013, and for a few years thereafter.

36.     Because Plaintiff herself was a minor child in foster care, and did not turn 18 until a few months before giving birth, Defendant City and the foster care agency were responsible for providing medical treatment to Plaintiff, including psychiatric treatment.

37.    When Plaintiff was under the age of 18, Defendant City and the foster care agency were responsible for consenting to the provision of medical treatment to Plaintiff, including the provision of medication.

38.    At some point prior to 2016, agents and employees of Defendant City and of the foster care agency had arranged for Plaintiff to be hospitalized for her mental health problems and to be treated with medication and psychotherapy.

39.    The hospitalization and medical treatment were successful, and, sometime after 2016, Plaintiff's psychiatrists decided that Plaintiff no longer needed psychiatric medication or treatment.

40.    Upon information and belief, Defendant City and the foster care agency knew that the psychiatric treatment was successful and consented to the discontinuance of Plaintiff's medication.

41.    Upon information and belief, employees of Defendant City and the foster care agency observed that Plaintiff continued to function successfully, without any recurrence of psychiatric problems, after Plaintiff's psychiatrists had terminated Plaintiffs' psychiatric medication.

42.    Upon information and belief, medical staff at Defendant Montefiore who provided prenatal care for Plaintiff during her pregnancy determined that it was not medically necessary to reinstate any psychiatric medications during Plaintiff's pregnancy.

43.    Upon information and belief, employees of Defendant City and the foster care agency observed Plaintiff's planning for the birth of her baby and saw that Plaintiff would provide good, loving care for the newborn.

44.    Upon information and belief, employees of Defendant City and the foster care agency observed the enthusiasm of Plaintiff's foster mother for a new baby, and assessed favorably the ability and willingness of Plaintiff's foster mother to assist Plaintiff in caring for the new baby.

45.    Upon information and belief, employees of Defendant City and the foster care agency knew that Plaintiff's paternal aunt was involved in Plaintiff's life, was enthusiastic about the upcoming birth, and was willing and able to help Plaintiff care for the new baby.

46.    In preparation for the birth, the foster care agency, with the knowledge and consent of Defendant City, purchased a crib and other supplies for Plaintiff's baby and had the items delivered to the foster home prior to the birth.

47.    In late 2019, Plaintiff went into labor and was taken to Montefiore by her paternal aunt.  Plaintiff's foster mother and Plaintiff's grandmother arrived at the hospital shortly thereafter.  After a few hours of labor, Infant Plaintiff L.W. was born healthy, early in the morning.

48.    Defendant Montefiore placed Plaintiff and Infant Plaintiff together in a room in the hospital, where Plaintiff and Infant Plaintiff remained for the next two days.  While Infant Plaintiff and Plaintiff were in the hospital together, Plaintiff provided for all of Infant Plaintiff's needs. Plaintiff nursed Infant Plaintiff, changed Infant Plaintiff's diaper when needed, bathed Infant Plaintiff when needed, held Infant Plaintiff when Infant Plaintiff cried, and provided Infant Plaintiff with maternal love and affection. When Infant Plaintiff awakened in the middle of the night, Plaintiff attended to Infant Plaintiff, provided loving care to her newborn daughter. To Infant Plaintiff L.W., Plaintiff was L.W.'s whole life.

**Defendant Montefiore plans to discharge L.W. to Plaintiff**

49.    For the next two days, while both Plaintiff and Infant Plaintiff L.W. were in the hospital, medical staff at Montefiore consistently noted that Plaintiff and her baby were bonding positively, that Infant Plaintiff was healthy, and that Infant Plaintiff would be discharged to Plaintiff's care when both mother and baby were medically ready to leave the hospital.

50.    Upon information and belief, doctors at Montefiore knew that Plaintiff had suffered from mental illness in the past and concluded that Plaintiff was capable of caring for Infant Plaintiff.

51.     On the third day of Infant Plaintiff's life, doctors at Montefiore determined that Plaintiff and Infant Plaintiff were medically ready for discharge, and they approved the discharge of both mother and baby.

**Defendant Deleon's baseless accusations against Plaintiff and wrongful removal of Infant Plaintiff**

52.     The plan to discharge Infant Plaintiff to Plaintiff's care and custody changed abruptly when Defendant Carmen Deleon entered Plaintiff's hospital room.  From start to finish, Defendant Deleon acted hostile, unprofessional, and bigoted toward Plaintiff.

53.     Seeing that Plaintiff was filling out a form for a birth certificate for Infant Plaintiff, Defendant Deleon ordered to stop doing so and immediately feed Infant Plaintiff, who was lying peacefully next to Plaintiff and not crying or fussing.

54.     When Plaintiff continued to complete the form instead of immediately complying with Defendant Deleon's irrational demands, Defendant Deleon became furious, apparently viewing Plaintiff's response as an instance of insolence against Deleon.  Defendant Deleon wrongfully accused Plaintiff of being aggressive, defensive and defiant.

55.     Black women are regularly stereotyped as "angry" and "aggressive," especially in the context of mental health diagnosis and treatment.[1]

---

[1] *See* Wendy Ashley, *The Angry Black Woman: The Impact of Pejorative Stereotypes on Psychotherapy with Black Women*, SOCIAL WORK IN PUBLIC HEALTH, Vol. 29, Issue 1 (2014), https://pubmed.ncbi.nlm.nih.gov/24188294/.

56.    In a two-paragraph medical note summarizing her meeting with Plaintiff and Infant Plaintiff, Defendant Deleon referred to Plaintiff as "Teen mom," "Teen mother," or "Teen" eight times.

57.    Black mothers "continue to be stereotyped" as "young" and "single," stereotypes that are often met "with disapproval and denigration."[2]

58.    Shortly after meeting with Plaintiff, Defendant Deleon called the New York State Central Register of Child Abuse and Maltreatment and reported, upon information and belief, that Plaintiff had a history of mental health issues and was behaving in a jumpy, erratic, and defiant manner, which endangered Infant Plaintiff.

59.    The report was not true.  At all times during Infant Plaintiff's first days, Plaintiff provided loving, concerned, and appropriate care for Infant Plaintiff, and never mistreated or endangered Infant Plaintiff.

60.    Upon information and belief, the report was transmitted electronically to ACS for investigation.

61.    After Infant Plaintiff was medically cleared for discharge, and pending ACS's investigation, Defendants Montefiore and Deleon removed Infant Plaintiff from Plaintiff's custody and took Infant Plaintiff into the custody of Defendant Montefiore.  Defendants Deleon and Montefiore advised Plaintiff that Defendant Montefiore would discharge Plaintiff from the hospital, but that they would not permit Infant Plaintiff to leave the hospital with Plaintiff.  Instead,

---

[2] *See* Lisa Rosenthal & Marci Lobel, *Stereotypes of Black American Women Related to Sexuality and Motherhood*, Psychol Women Q. 40(3): 414-427 (Sept. 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5096656/.

Defendant Montefiore would keep Infant Plaintiff on the basis of Defendant Deleon's report. Defendants Deleon and Montefiore also advised plaintiff that they had notified ACS and that they expected an ACS investigator to arrive at the hospital.

62. Plaintiff was horrified and distraught by the actions of Defendants Deleon and Montefiore. She would not abandon her baby, and so she decided to remain at the hospital with Infant Plaintiff, awaiting the arrival of someone from ACS. Defendants Deleon and Montefiore, while they did not physically evict Plaintiff from the hospital, forbade Plaintiff from taking Infant Plaintiff out of the hospital.

63. Pursuant to state law, only police officers, peace officers, law enforcement officials, county child protective employees, and hospitals are authorized to take a child into custody, and may do so only when they have reasonable cause to believe that remaining in the custody of the parent presents an imminent danger to the child's life or health. N.Y. Soc. Serv. L. §§417(1)(a); 417(2).

64. At all times, Defendants Montefiore and Deleon lacked probable cause, or even a reasonable suspicion, to believe that Plaintiff was unfit to care for Infant Plaintiff.

65. At all times, Defendants Montefiore and Deleon lacked probable cause, or even a reasonable suspicion, to believe that Plaintiff posed an immediate danger to Infant Plaintiff.

66. Defendants Montefiore and Deleon prohibited Plaintiff from taking Infant Plaintiff from the hospital, canceling the previously planned discharge of Infant Plaintiff.

67. Defendant Montefiore has, in other circumstances, prohibited children from leaving the hospital after they are medically cleared for discharge pending ACS investigations, without regard to whether there is probable cause, or even reasonable suspicion, to believe the child is in danger of being abused or neglected. *See, e.g., Matter of Lisa A.*, 57 Misc.3d 948 (N.Y. Fam. Ct. Bronx Cnty. 2017).

68. Upon information and belief, employees of Defendant Montefiore have stated under oath during discovery in other lawsuits that Defendant Montefiore has a policy of detaining children at the hospital after they are medically discharged any time a report to the New York State Central Register of abuse or neglect is made, regardless of whether there is probable cause, or even reasonable suspicion, that a child is in danger of being abused or neglected.

**The ACS Defendants' wrongful removal of Infant Plaintiff**

69. Upon information and belief, when Defendant City received the report from the New York State Central Register of Child Abuse and Maltreatment, Defendant City assigned Defendants Lafontant and "Jane Doe" to investigate the report.

70. Upon information and belief, Defendant City assigned Defendant Rendon to supervise Defendants Lafontant and Jane Doe.

14

71.    Upon information and belief, Defendant City assigned Defendant Faulk Jean-Pierre to supervise Defendant Rendon.

72.    All reports that are accepted by the New York State Central Register of Child Abuse and Maltreatment and transmitted to local child protective services, one of which is New York City's Administration for Children's Services, must be investigated by the local service.  N.Y. Social Services Law §424.  However, upon investigation, almost two-thirds of the reports are determined to be false, i.e., not supported by even "some credible evidence."  N.Y. Social Services Law §§412(6), 412(7).

73.    Certain professionals who work with parents or children are required by law to make reports to the New York State Central Register when they have reasonable cause to believe that a child has been abused or maltreated.  N.Y. Soc. Serv. L. §412(6).

74.    Professionals who fail to report suspected child abuse or maltreatment may be subject to arrest, prosecution, or incarceration for up to a year.

75.    Professionals who make reports of suspected child abuse and maltreatment which, upon investigation, are determined to be unfounded, are not subject to any penalties.

76.    The harsh penalties for failing to report suspected child abuse or maltreatment, coupled with the lack of penalties for professionals who wrongfully

report child abuse and maltreatment, lead to massive over-reporting of child abuse by professionals in the State of New York.

77.     More than 50 percent of reports to the New York State Central Register of Child Abuse and Maltreatment made by professionals who work with children are unfounded.

78.     Approximately 90 percent of reports to the New York State Central Register never lead to the filing of a case.

79.     As a result of said over-reporting, government investigators must carefully investigate all reports, including those made by professionals.

80.     In the late afternoon of November 29, 2019, Defendants Lafontant and Doe arrived at Montefiore and interviewed J.W.

81.     Upon information and belief, Defendants Lafontant and Doe found that Plaintiff posed no danger to Infant Plaintiff.

82.     Upon information and belief, Defendant Lafontant observed that Plaintiff was respectful throughout their conversation.

83.     Defendants Faulk Jean-Pierre, Rendon, Lafontant, and Doe conducted a constitutionally inadequate investigation of the allegations against Plaintiff.

84.     Upon information and belief, Defendants Faulk Jean-Pierre, Rendon, Lafontant, and Doe failed to question Plaintiff's foster mother, paternal aunt, or grandmother, all of whom were present at the hospital and were willing to speak with Defendants.

85.     Upon information and belief, Defendants Faulk Jean-Pierre, Rendon, Lafontant, and Doe learned from staff at the foster care agency which cared for Plaintiff that Plaintiff would be a caring, reliable parent for Infant Plaintiff, that both Plaintiff's foster mother and paternal aunt were certified as foster parents, and that either of them would provide caring, reliable care for Infant Plaintiff, if need be.

86.     Upon information and belief, Defendants Rendon and Faulk Jean-Pierre ordered Defendants Lafontant and Doe to remove Infant Plaintiff from the custody of Defendant Montefiore and take Infant Plaintiff into the custody of Defendant City of New York.

87.     At approximately 10:00 p.m., Defendant Lafontant pulled Infant Plaintiff out of Plaintiff's arms while Plaintiff was nursing Infant Plaintiff. Lafontant threatened to summon the police if Plaintiff resisted.

88.     At least five hours passed between the time the Defendants Deleon and Montefiore took Infant Plaintiff into the custody of Defendant Montefiore and the time that the Defendants Lafontant and Doe took Infant Plaintiff into the custody of Defendant City of New York.

89.     When Plaintiff asked Defendant Lafontant where Lafontant was taking Infant Plaintiff, Lafontant, who is Black, told Plaintiff that removals of children by ACS happen "too often" to "our kind."

90.     A recent internal ACS audit of the state of racial equity in New York City's child welfare system confirms Lafontant's concern that racial bias

infects the whole system. In the report, agency staff "described ACS as a predatory system that specifically targets Black and Brown parents and applies a different level of scrutiny to them throughout their engagement with ACS."[3]

91.    Agency staff also "described a system where race operates as an indicator of risk," where "white families receive preferential treatment" because of "racism and pervasive anti-Black stereotypes about the abilities of Black and Brown parents to provide for their children."[4]

92.    Statistics bear out the systemwide racial bias reported by ACS's own caseworkers. Black New Yorkers are seven times as likely as white families to be accused of child maltreatment and thirteen times more likely to have their children removed.

93.    Plaintiff was a victim of these "pervasive" assumptions about Black mothers and is one example of many Black parents that ACS's own staff admits the agency wrongly assume to be unfit to care for their children. After Lafontant took Infant Plaintiff from Plaintiff's arms, Lafontant told Plaintiff that Plaintiff would be unable to see Infant Plaintiff until the following Monday and did not tell Plaintiff where she was taking Infant Plaintiff.

94.    None of the Defendants sought or obtained a court order authorizing the removal and detention of Infant Plaintiff from Plaintiff.

---

[3] DRAFT: New York City Administration for Children's Services Racial Equity Participatory Action Research & Systems Audit: Findings and Opportunities, at 14 (Dec. 2020), *available at* https://www.bronxdefenders.org/wp-content/uploads/2022/11/DRAFT_NIS_ACS_Final_Report_12.28.20.pdf.
[4] *Id.* at 15.

95.    Plaintiff never consented to the removal or detention of Infant Plaintiff.

96.    Acting with the knowledge and consent of Defendants Faulk Jean-Pierre and Rendon, Defendants Lafontant and Doe took Infant Plaintiff to an institution for children. Defendants Faulk Jean-Pierre and Rendon, Lafontant and Doe prohibited Plaintiff from visiting Infant Plaintiff during the entire weekend, and even refused to tell Plaintiff where they were taking Infant Plaintiff.

97.    Defendant Lafontant told Plaintiff only that Plaintiff should go to the Family Court on Monday for a hearing about Infant Plaintiff's custody.

98.    As Defendant Lafontant had instructed, Plaintiff arrived in Family Court at 8:00 a.m. that Monday, accompanied by her paternal aunt.

99.    Plaintiff waited in court all day, but Defendants never provided Plaintiff with an opportunity to be heard.

**Defendants file a meritless petition four days after removing Infant Plaintiff**

100.    The next day, four days after removing Infant Plaintiff from Plaintiff, Defendants City, Faulk Jean-Pierre, Rendon, and Lafontant commenced child neglect proceedings against Plaintiff by filing a petition in the family court, which alleged that Plaintiff had neglected and/or endangered Infant Plaintiff.

101.    Defendant Lafontant signed the petition under oath.

102.    The allegations in the petition were untrue.

103.    Upon information and belief, Defendants City, Faulk Jean-Pierre, Rendon, and Lafontant knew that the allegations against Plaintiff were untrue.

104.    In the alternative, Defendants City, Faulk Jean-Pierre, Rendon, and Lafontant made said allegations in reckless disregard of the truth.

**Judge Returns Infant Plaintiff to Plaintiff**

105.    Plaintiff again returned to the Bronx Family Court first thing on the morning of the next day, arriving promptly at 8:00 a.m.

106.    Plaintiff again waited in family court the entire day. Just before the end of the day, Plaintiff went before a judge, who ordered Defendants to return Infant Plaintiff to Plaintiff.

107.    Defendants had no reason to believe that Infant Plaintiff had been the victim of child neglect or was at imminent risk of danger, and had no basis to effectuate her extrajudicial, emergency removal.

108.    Despite the judge's order returning Infant Plaintiff to Plaintiff, Defendants City, Faulk Jean-Pierre, Rendon, and Lafontant continued to prosecute Plaintiff for child neglect in the Family Court until February 22, 2021.

109.    On February 22, 2021, the family court judge dismissed all charges against Plaintiff, thereby terminating the proceedings in Plaintiff's favor.

**Defendant City's policy and practice of unlawfully separating Black and Brown families**

110. In New York City, 4,300 Black children (one in ninety) are in foster care as compared with 406 White children (one in 1,100).

111. In 2018, "almost all" of the approximately 2,000 children that Defendant City separated from their parents on an emergency basis without court order were children of color.

112. Between 2014 and 2018, the percentage of cases in which Defendant City conducted emergency removals without a court order jumped from 34 percent to 47 percent.[5]

113. According to a December 2020 report commissioned by Defendant City's child welfare agency ACS, ACS operates a "predatory system" that subjects Black and Brown parents to a "different level of scrutiny."[6]

114. The report finds that "Black and Brown parents are treated at every juncture as if they are not competent parents capable of providing acceptable care to their children."

115. It concludes that "race operates as an indicator of risk," and "Black and Brown parents are generally presumed to be a risk to their children are often stripped of their ability to make decisions about their families."

---

[5] *See* Yasmeen Khan, *Family Separations in Our Midst*, WNYC (April 17, 2019), https://www.wnyc.org/story/child-removals-emergency-powers/.
[6] *See* New York City Administration for Children's Services Racial Equity Participatory Action Research & Systemic Audit (Dec. 2020), *available at* https://int.nyt.com/data/documenttools/draft-report-of-nyc-administration-for-children-s-services-racial-equity-survey/fc3e7ced070e17a4/full.pdf.

116.    The report made a series of recommendations about how to address this systemic racial bias in Defendant City's decision-making about separating children from their parents.

117.    Upon information and belief, Defendant City has not adopted any of these recommendations and has otherwise taken no steps to address its racist system of family separation since receiving this draft report 23 months ago.

118.    As a result of these illegal actions, Plaintiff has suffered a violation of her constitutional rights, as well as emotional trauma, including but not limited to fear, embarrassment, humiliation, emotional distress, depression, anxiety, and loss of sleep.

119.    As a result of these illegal actions, Infant Plaintiff has suffered a violation of her constitutional rights, including but not limited to the loss of her liberty and the loss of the care and guidance of her mother.

## AS AND FOR A FIRST CAUSE OF ACTION
### (42 U.S.C. § 1983 – Due Process, Unlawful Search and Seizure, Interference with Intimate Association, and Denial of Equal Protection of Laws Against All Defendants on Behalf of Plaintiff and Infant Plaintiff)

120.    Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs with the same force and effect as if the same were fully set forth herein.

121.    Upon information and belief, during the year 2019, and continuing to the present, Defendants City and Montefiore had a policy and/or practice of removing and detaining children from parents who did not abuse,

neglect, or endanger the children, without probable cause, without due process of law, and without constitutionally adequate investigations.

122.   Upon information and belief, during the year 2019, and continuing to the present, Defendant Montefiore had a policy and/or practice of removing and detaining children from parents whenever a Montefiore employee made a report of suspected child abuse or maltreatment to that New York State Central Register of Child Abuse or Maltreatment regarding a child who was medically ready for discharge from the hospital, regardless of whether the parent posed an immediate danger of harming the child.

123.   Acting pursuant to said policy, and because of racial animus toward Black mothers, Defendant Deleon removed and detained Infant Plaintiff from the custody of Plaintiff, without probable cause, without due process of law, and without a constitutionally adequate investigation.

124.   Upon information and belief, during the year 2019, and continuing to the present, in investigating allegations of alleged child neglect, and in removing and detaining children as a result of those investigations, Defendant City had a policy or practice of taking the statements of individuals who report child maltreatment at face value, ignoring evidence to the contrary, and without making any inquiry into the bias or animus of the reporter.

125.   Upon information and belief, during the year 2019, and continuing to the present, in investigating allegations of alleged child neglect, and

in removing and detaining children as a result of those investigations, Defendant City had a policy and/or practice of ignoring available exculpatory evidence.

126.    Upon information and belief, during the year 2019, and continuing to the present, in prosecuting alleged child abuse and neglect, Defendant City had a policy and/or practice of continuing to prosecute parents after probable cause dissipates.

127.    Upon information and belief, during the year 2019, and continuing to the present, Defendant City had a policy and/or practice of conducting constitutionally deficient investigations of reports of possible neglect, and ignoring facts that would demonstrate that the reports were unfounded.

128.    Upon information and belief, during the year 2019, and continuing to the present, Defendant City had a policy and/or practice of discriminating against parents and children based upon their race.

129.    Acting pursuant to said policy, Defendants, by their individual and joint actions, discriminated against Plaintiff and Infant Plaintiff based upon their race in separating and detaining Infant Plaintiff from Plaintiff, and in commencing and continuing the prosecution of plaintiff in the New York Family Court.

130.    Acting pursuant to said policies and/or practices, Defendants Deleon, Montefiore, Faulk Jean-Pierre, Rendon, Doe, and Lafontant removed and detained Infant Plaintiff from the custody of Plaintiff, without probable cause and without due process of law.

131. Acting pursuant to said policies and/or practices, Defendants Faulk Jean-Pierre, Rendon, and Lafontant initiated and continued the wrongful prosecution of Plaintiff in the Family Court by causing a petition to be filed that contained facts they knew or should have reasonably known were untrue, and that omitted exculpatory information which said Defendants knew or should have known was material.

132. Acting pursuant to said policies and/or practices, Defendants Faulk Jean-Pierre, Rendon, and Lafontant continued the detention of Infant Plaintiff from Plaintiff, and interfered with the relationship between Plaintiff and Infant Plaintiff, without probable cause and without due process of law.

133. Acting pursuant to said policies and/or practices, Defendants Faulk Jean-Pierre, Rendon, and Lafontant commenced and continued the wrongful prosecution of Plaintiff in the Family Court. Said policies and/or practices, and their implementation, were gross deviations from acceptable professional conduct.

134. Said policies and/or practices, and their implementation, constituted an unlawful interference with Plaintiff's liberty interest in the care and custody of her child and her right of intimate association with her child, in violation of the First and Fourteenth Amendments to the United States Constitution. Said policies and/or practices constituted an unlawful interference with Infant Plaintiffs' liberty interest in her mother and her right of intimate association with her mother, in violation of the First and Fourteenth Amendments to the United States Constitution. Said policies and/or practices constituted a denial of the equal

protection of laws to plaintiff and infant plaintiff. Said policies and/or practices, and

their implementation, were gross deviations from acceptable professional conduct.

135.    The implementation of said policies and/or practices caused the

unlawful seizure and detention of the Infant Plaintiff, in violation of the Fourth

Amendment to the United States Constitution.

136.    As a result of all Defendants' actions, Plaintiff suffered the loss

of the custody, companionship, and love of her child, Infant Plaintiff suffered the

loss of the love and companionship of her mother, Plaintiff incurred expenses, and

both Plaintiff and Infant Plaintiff suffered humiliation, pain and suffering, terror,

and mental anguish, all of which is ongoing.

## AS AND FOR A SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 – Inadequate Training and Supervision Against Defendants City and Faulk Jean-Pierre on Behalf of Plaintiff and Infant Plaintiff)

137.    Plaintiffs repeat and reallege each and every allegation

contained in the above paragraphs with the same force and effect as if fully set forth

herein.

138.    Defendants City and Faulk Jean-Pierre provided grossly

inadequate and unprofessional training and/or supervision to their agents and

employees regarding:

    a.  investigating child abuse and neglect cases;

    b.  determining whether a complaint of suspected child maltreatment has

        been based upon racial or ethnic animus or bias on the part of the

        complainant;

c.   determining whether there exists probable cause to believe that continuing in the care of a parent presents an imminent danger to the child's life or health;

d.   determining whether there exists probable cause to believe that returning to the care of a parent presents an imminent danger to the child's life or health;

e.   determining whether there exists probable cause to believe that a parent has neglected or abused his or her child;

f.   the provision of adequate notice and an opportunity to be heard prior to the removal of a child;

g.   the constitutional rights of parents and children in child abuse investigations;

h.   the rights of parents to be free from wrongful prosecutions in the Family Court for child abuse and child neglect; and

i.   withdrawing child abuse and neglect charges against parents when probable cause dissipates.

139.   Defendants City and Faulk Jean-Pierre knew or should have known that their employees were improperly trained and/or supervised in said issues.

140.   In failing to provide proper training and/or supervision, Defendants City and Faulk Jean-Pierre were deliberately indifferent to the risk that their employees would violate the constitutional rights of parents and children, including the Plaintiff and Infant Plaintiff.

141.    Defendant City knew or should have known that its employees would confront said issues, and that, without adequate training and/or supervision, would likely make the unconstitutional decisions when said issues arose.

142.    By reason of their lack of training and/or supervision, Defendants Faulk Jean-Pierre, Rendon, and Lafontant removed Infant Plaintiff from Plaintiff.

143.    By reason of their lack of training and/or supervision, Defendants Faulk Jean-Pierre, Rendon, and Lafontant continued the wrongful separation of Plaintiff and Infant Plaintiff, without even permitting Plaintiff and Infant Plaintiff to visit each other, at a time when it was developmentally important for Infant Plaintiff to bond with Plaintiff, without adequate notice to Plaintiff, adequate investigation, probable cause, or due process of law.

144.    By reason of their lack of training and supervision, Defendants Faulk Jean-Pierre, Rendon, and Lafontant wrongfully prosecuted Plaintiff in family court.

145.    As a result of all Defendants' actions, Plaintiff suffered the loss of the custody, companionship, and love of her child, Infant Plaintiff suffered the loss of the love and companionship of her mother, Plaintiff incurred expenses, and both Plaintiff and Infant Plaintiff suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

### AS AND FOR A THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983 – Malicious Prosecution Against Defendants City, Faulk Jean-Pierre, Rendon, and Lafontant on Behalf of Plaintiff)

146.    Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

28

147.    Upon and belief, in 2019, and continuing through the present, Defendant City had a policy and/or standard practice of commencing and continuing child abuse proceedings based on information that it knew, or should have known, to be false or unreliable.

148.    Acting pursuant to said policy and/or practice, Defendants Faulk Jean-Pierre, Rendon, and Lafontant commenced and continued child abuse proceedings against Plaintiff based upon false, unreliable information.

149.    Acting pursuant to said policy and/or practice, Defendants Faulk Jean-Pierre, Rendon, and Lafontant continued the prosecution of Plaintiff in the Family Court for many months after probable cause had dissipated.

150.    Said Defendants caused said charges to be commenced and continued willfully, maliciously, and without probable cause or legal justification or excuse, and for reasons other than to see justice done.

151.    Said Defendants caused said charges to be filed and continued despite having no probable cause to believe that Plaintiff was guilty of child abuse or neglect.

152.    Said Defendants caused said charges to be filed and continued with the intent to cause harm and injury to Plaintiff and not for the protection of Plaintiff's child.

153.    In commencing and continuing said charges, Defendants Faulk Jean-Pierre, Rendon, and Lafontant, in gross and wanton disregard of Plaintiff's rights,

violated Plaintiff's right to be free of abuse of process under the Fourth and Fourteenth Amendments to the United States Constitution.

154.    Defendant City failed to adopt any policies for withdrawing child abuse proceedings when probable cause dissipates.

155.    Defendant City knew or should have known that the failure to adopt policies would cause its employees to abuse government power by filing and continuing child abuse proceedings maliciously and without probable cause.

156.    In commencing and continuing said charges, Defendants Faulk Jean-Pierre, Rendon, and Lafontant, in gross and wanton disregard of Plaintiff's rights, violated Plaintiff's right to be free of malicious prosecution under the Fourth and Fourteenth Amendments of the United States Constitution.

157.    As a result of all Defendants' actions, Plaintiff suffered the loss of the custody, companionship, and love of her child, Infant Plaintiff suffered the loss of the love and companionship of her mother, Plaintiff incurred expenses, and both Plaintiff and Infant Plaintiff suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

## AS AND FOR A  FOURTH CAUSE OF ACTION
### (Negligence Under New York Common Law Against All Defendants on Behalf of Plaintiff and Infant Plaintiff)

158.    Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs with the same force and effect as if the same were fully set forth herein.

159.    The conduct of Defendants Faulk Jean-Pierre, Lafontant, Rendon, and Doe occurred while they were on duty during the course and scope of their duties and functions as ACS employees, and/or while they were acting as agents and/or employees of Defendant City of New York, making Defendant City of New York liable to Plaintiffs under the doctrine of *respondeat superior*.

160.    The conduct of Defendant Deleon occurred while she was on duty during the course and scope of her duties and functions as a social worker at Defendant Montefiore, and/or while she was acting as an agent and/or employee of Defendant Montefiore, making Defendant Montefiore liable to Plaintiffs under the doctrine of *respondeat superior*.

161.    Defendants had a duty to act with reasonable care toward Plaintiff to act with a high degree of care toward Infant Plaintiff, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that an injury to Plaintiffs would probably result from their conduct.

162.    Defendants' actions alleged herein constitute a gross breach of said duty and a gross deviation from accepted professional standards.

163.    As a direct and proximate result of Defendants' actions, Plaintiff and Infant Plaintiff suffered the damages herein alleged.

164.    Defendants' conduct amounted to utter recklessness, was so wantonly negligent as to be the equivalent of a conscious disregard for Plaintiffs' rights, demonstrated a high degree of moral culpability, was designed to oppress and

injure, and evinced a conscious indifference to the effects of their acts, entitling Plaintiffs to an award of punitive damages.

165.    As a result of all Defendants' actions, Plaintiff suffered the loss of the custody, companionship, and love of her child, Infant Plaintiff suffered the loss of the love and companionship of her mother, Plaintiff incurred expenses, and both Plaintiff and Infant Plaintiff suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

## AS AND FOR A FIFTH  CAUSE OF ACTION
### (False Imprisonment Under New York Law Against All Defendants on Behalf of Infant Plaintiff)

166.    Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs with the same force and effect as if the same were fully set forth herein.

167.    The conduct of Defendants Lafontant, Rendon, Faulk Jean-Pierre, and Doe occurred while they were on duty during the course and scope of their duties and functions as ACS employees, and/or while they were acting as agents and/or employees of Defendant City of New York, making Defendant City of New York liable to Plaintiffs under the doctrine of *respondeat superior*.

168.    The conduct of Defendant Deleon occurred while she was on duty during the course and scope of her duties and functions as a Montefiore employee, and/or while she was acting as an agent and/or employee of Defendant Montefiore, making Defendant Montefiore liable to Plaintiffs under the doctrine of *respondeat superior*.

169.    Defendant Deleon intended to confine Infant Plaintiff at Montefiore Hospital; Infant Plaintiff was aware of her confinement; Infant Plaintiff did not consent to the confinement; and the confinement was not otherwise privileged or supported by probable cause.  Defendants Faulk Jean-Pierre, Lafontant, Rendon, and Doe intended to confine Infant Plaintiff in the custody of Defendant City; Infant Plaintiff was aware of her confinement, Infant Plaintiff did not consent to the confinement, and the confinement was not otherwise privileged or supported by probable cause.

170.    As a direct and proximate result of Defendants' actions, Infant Plaintiff suffered the damages alleged herein.

171.    Defendants' conduct toward Infant Plaintiff was wanton, reckless, willful, malicious, and/or designed to oppress or injure her, entitling Infant Plaintiff to an award of punitive damages.

172.    As a result of all Defendants' actions, Plaintiff suffered the loss of the custody, companionship, and love of her child, Infant Plaintiff suffered the loss of the love and companionship of her mother, Plaintiff incurred expenses, and both Plaintiff and Infant Plaintiff suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

**AS AND FOR A SIXTH CAUSE OF ACTION**
**(Interference with Child Custody under New York Law (Against All Defendants on behalf of Plaintiff)**

173.    Plaintiffs repeat and reallege each and every allegation contained in the above paragraphs with the same force and effect as if the same were fully set forth herein.

174.    By removing and detaining Plaintiff's child from Plaintiff, all Defendants unlawfully interfered with Plaintiff's custody of her child, in violation of New York law.

175.    As a result of all Defendants' actions, Plaintiff suffered the loss of the custody, companionship, and love of her child, Infant Plaintiff suffered the loss of the love and companionship of her mother, Plaintiff incurred expenses, and both Plaintiff and Infant Plaintiff suffered humiliation, pain and suffering, terror, and mental anguish, all of which is ongoing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against Defendants as follows:

1.    Awarding Plaintiff and Infant Plaintiff compensatory damages in an amount to be determined at trial;

2.    Awarding Plaintiff and Infant Plaintiff punitive damages in an amount to be determined at trial;

3.    Awarding Plaintiff and Infant Plaintiff interest from Infant Plaintiff's date of birth through the present;

4.    Awarding Plaintiff and Infant Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. 1988; and

5.      Directing such other and further relief as the Court may deem just and proper, together with attorneys' fees, interest, costs, and other disbursements of this action.

Dated: March 2, 2023
      New York, New York

 

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____/s/_____
Katherine Rosenfeld
Max Selver
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

LANSNER & KUBITSCHEK

_____/s/_____
Carolyn A. Kubitschek
325 Broadway, Suite 203
New York, NY 10007
(212) 349-0900
ckubitschek@Lanskub.com

*Attorneys for Plaintiffs*